UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

UNITED STATES OF AMERICA,

                                                       **MEMORANDUM & ORDER**
        -against-                                21-CR-11(EK)

MARCOS JIMENEZ-RODRIGUEZ,

                        Defendant.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

        Defendant Marcos Jimenez-Rodriguez is charged in a superseding indictment arising from his alleged participation in a sex-trafficking conspiracy.[1] Since his arrest on April 7, 2021, he has been detained at the Metropolitan Detention Center ("MDC") in Brooklyn. He now moves for bail (for the third time), or, in the alternative, for temporary release until the conclusion of trial. Among other arguments in support of his release, Jimenez-Rodriguez contends that the MDC is failing to provide adequate care for his serious health conditions: chronic diabetes and diabetic retinopathy (a complication of diabetes affecting the eyes). He advises that the latter condition has led to substantial impairment of vision in his right eye and has

---

[1] The superseding indictment names Jimenez-Rodriguez in four counts: (1) sex trafficking conspiracy, 18 U.S.C. § 1594(c); (2) interstate prostitution, 18 U.S.C. § 2422(a); (3) alien smuggling conspiracy, 8 U.S.C. § 1324(a)(1)(A)(v)(I), (a)(1)(B)(i); and (4) money laundering conspiracy, 18 U.S.C. § 1956(h). See Superseding Indictment, ECF No. 133. The indictment also names Jimenez-Rodriguez's brother Leonardo as his co-conspirator, as discussed below.

also begun to affect his left eye.  To date, the Court has taken several steps to address his medical needs.[2]  While the Court will continue to monitor this issue, the instant motion is denied for the reasons set forth below.

## I.   Discussion

### A.   Legal Standard

Because Jimenez-Rodriguez is charged with violating 18 U.S.C. § 1954(c), which authorizes a potential life term of imprisonment, a rebuttable presumption arises that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(D).  In a presumption case, the defendant "bears a limited burden of production" — not persuasion — to rebut the presumption by offering "evidence that he does not pose a danger to the community or a risk of flight."

---

[2] On January 11, 2023, the Court appointed Dr. Jeffrey Korff, a diabetes specialist, to advise on Jimenez-Rodriguez's medical needs at the request of defense counsel.  Two days later, the Court held a telephonic status conference regarding Jimenez-Rodriguez's health condition and treatment.  See Minute Entry dated Jan. 13, 2023, ECF No. 160.  The Court also directed the MDC to share medical records and information with the government and Dr. Korff.  See, e.g., Order dated Feb. 3, 2023.

The Court has also solicited the attendance and participation of MDC personnel in court conferences.  On February 15, 2023, the Court held an in-person status conference with two legal representatives from the MDC present to advise on Mr. Jimenez-Rodriguez's treatment plan and appointment schedule.  See Minute Entry dated Feb. 15, 2023, ECF No. 182.  More recently, an MDC attorney attended a status conference on May 10.  There, the parties and the MDC representative discussed not only the timing of Mr. Jimenez-Rodriguez's next appointment, but also the potential scheduling of monthly recurring appointments through year-end.  See Minute Entry dated May 10, 2023, ECF No. 217.  This conversation culminated in the MDC's letter of May 12, see ECF No. 218, discussed in detail below.

*United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). If the defendant proffers such evidence, "the presumption favoring detention does not disappear entirely, but remains a factor" for the district court to consider. *Id.*

In determining whether the defendant has carried his burden, courts apply the factors set forth in Section 3142(g), including the nature and circumstances of the offense, the weight of the evidence, and the defendant's history and characteristics. *Id.* In the bail context, the parties typically present evidence by proffer, *see United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000), and the rules of evidence do not apply. *See* 18 U.S.C. § 3142(f)(2).

**B.   Risk of Flight**

Jimenez-Rodriguez has failed to overcome the flight-risk presumption. The government's allegations against him (*i.e.*, the nature and circumstances of the offense) are serious. He faces four felony counts and the possibility of life imprisonment.[3] The government alleges that he participated in a long-term sex-trafficking operation, including by assisting his brother Leonardo in forcing women to work in prostitution, taking their earnings, and abusing them physically and

---

[3] When the Court inquired about the potential range of imprisonment under the advisory Sentencing Guidelines, defense counsel acknowledged that the range would be "high." Apr. 10, 2023 Conference Tr. 20:1, ECF No. 215.

3

emotionally.  *See* Gov't Letter dated Mar. 31, 2023, ECF No. 200 at 2.[4]

The government contends that Jimenez-Rodriguez brutally abused — personally — one of the victims (whom the government refers to as "A").  *Id.*  He allegedly "punched and hit the victim, struck her with electrical cords and belts and choked her to the point of losing consciousness."  *Id.*  He also allegedly "forced the victim to have sex with him after beating her" on multiple occasions, including once in the presence of a child.  *Id.*  Although Jimenez-Rodriguez disputes A's testimony and suggests that she has a strong (immigration-related) incentive to lie, *see* Def. Second Bail Mot. 3-4, ECF No. 189, the severity of these allegations weighs against release.

In addition to A's testimony, the government's proffered evidence includes the statements of two other victims ("V" and "Y"), travel and border crossing records, and financial records reflecting transfers of alleged trafficking proceeds, among other evidence.  *See* ECF No. 200 at 5; Gov't Letter dated Apr. 7, 2021, ECF No. 200-1 at 4.  Jimenez-Rodriguez has disputed much of this evidence.  For example, he states — based in part on an interview conducted by his private investigator — that he expects Y to testify that he "never forced her to do

---

[4] Page numbers in citations to record documents other than transcripts refer to ECF pagination.

4

anything" and "does not believe him to be a violent person." ECF No. 189 at 4.  Jimenez-Rodriguez declined, however, to reveal the substance of the investigator's conversation with Victim Y to the government at this stage.  *See* Def. Letter dated Apr. 17, 2023, ECF No. 209 at 1.  This decision may be understandable from a tactical perspective; nevertheless, it does limit (to some degree) the import of Jimenez-Rodriguez's proffer on this point, as the government cannot respond to any specifics.

As to the third victim — "V" — the defense points to the government's contention that Jimenez-Rodriguez "witnessed" Leonardo's physical abuse of V on multiple occasions.  This contention, the defense notes, provides no indication that he personally engaged in such abuse.  Def. First Bail Mot. 5, ECF No. 94.  In the end, however, Jimenez-Rodriguez's contention that he did not personally use force or violence would not — even if credited fully — undermine the charges against him.  Count One, for example, charges him with conspiring to recruit, entice, harbor, and transport a victim by "force, fraud, *or* coercion" — meaning that force is not a necessary element of the government's case.[5]  18 U.S.C. §§ 1591, 1594(c).  Likewise, the

---

[5] In any event, the government does contend that Leonardo — Marcos's brother and alleged co-conspirator — used force on multiple occasions.  *See, e.g.*, Gov't Letter dated Sept. 6, 2022, ECF No. 99 at 2.

5

use of force is not a necessary component of Counts Three, Four, or Five. Moreover, given the conspiracy charged in Count One, Jimenez-Rodriguez may be held accountable for some of his brother's actions.

Jimenez-Rodriguez also contends that the government's proffered evidence in support of the money-laundering charge — mainly, wire transfer records — "undercut, rather than support, the government's claims." ECF No. 94 at 6. He argues that the amounts of these transfers (totaling approximately $70,000 over a ten-year period) were consistent with his earnings as a construction worker and were actually "remittances" to his family in Mexico. *Id.* The government responds that Jimenez-Rodriguez obtained the victims' prostitution earnings and sent that money to other members of the conspiracy in Mexico via wire transfers *and* shipments of cash. *See* ECF No. 200-1 at 3.

While the Court makes no judgment about the merits of the government's case at this stage, the weight of the proffered evidence supports, rather than undermines, the presumption that Jimenez-Rodriguez presents a substantial risk of flight.

Jimenez-Rodriguez's history and characteristics also favor detention. First, he has limited ties to the New York City area: he has no spouse living here or children attending local schools, no *demonstrable* history of consistent recent

employment, and no legal status in the United States.[6]  He does, however, have substantial ties to the Tenancingo region of Mexico, where he was born, maintains citizenship, and has family ties, including a sister whom he has financially supported in the past.  The sex-trafficking operation at issue was also allegedly based in Tenancingo.  *See* ECF No. 200-1 at 2.

Given that Jimenez-Rodriguez faces an elevated Guidelines range and the potential draw of Mexico, the proposed conditions of release — home detention with electronic monitoring, a $500,000 bond co-signed by six suretors, and surrender of his "U.S. citizen relatives' passports," ECF No. 189 at 2 — do not reasonably assure his appearance under Section 3142(e).  It is well settled that electronic monitoring can detect flight but is not guaranteed to prevent it.  *See United States v. Benatar*, No. 02-CR-99, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) ("[H]ome detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start.").  Nor can the suretors' commitments guarantee that Jimenez-Rodriguez will not flee.  And the offer by his U.S.-citizen relatives — whose identities the defense has not provided — to surrender their passports, *see* ECF No. 189 at

---

[6] Defense counsel has advised that Jimenez-Rodriguez worked off the books in construction for roughly twenty years; he worked full-time when jobs were available but also had intermittent periods of unemployment.  *See* Sept. 6, 2022 Conference Tr. 12:19, ECF No. 198; Apr. 13, 2023 Bail Hearing Tr. 25:1-6, ECF No. 210.

7

2, is no salve at all, given that the government cannot prevent them from leaving the country based on Jimenez-Rodriguez's non-compliance with bail conditions.

Thus, taking the relevant circumstances into account, the Court concludes that Jimenez-Rodriguez presents a risk of flight and that no condition or combination of conditions will adequately assure his appearance. Given that conclusion, I need not consider the dangerousness prong of the analysis at this stage.

C. **Jimenez-Rodriguez's Medical Needs**

Notwithstanding the presumption of detention, the Court has expressed a willingness to consider release if Jimenez-Rodriguez's continued detention presented a meaningful risk of irreversible vision loss. Put bluntly, it would be intolerable if pretrial detention came at the cost of blindness.[7]

In the instant application, the defense points to medical records indicating that when Jimenez-Rodriguez received an injection on March 24, Dr. Nilesh Raval — a treating ophthalmologist at the New York Eye and Ear Infirmary of Mount Sinai — directed that he receive another injection in four weeks' time. *See* Def. Third Bail Mot. 1, ECF No. 212 (citing ECF No. 201-4 at 6). The defense submits that as of May 5 — six

---

[7] The Bail Reform Act expressly contemplates the Court's consideration of a defendant's "physical and mental condition." 18 U.S.C. § 3142(g)(3)(A).

8

weeks later — the MDC had not taken Jimenez-Rodriguez to the Eye and Ear Infirmary for further treatment. *See id.*; Def. Letter dated May 9, 2023, ECF No. 213 at 1.[8]  To assess the risk of such delay, the Court requested that defense counsel provide a doctor's opinion or other medical evidence providing some way to understand *how brief* a lapse in treatment could result in permanent vision damage. *See, e.g.,* ECF No. 210 at 35:13-18. Defense counsel came forward with such information on May 12.

The defense submissions predating May 12 had been more nebulous, as the Court indicated at multiple status conferences. *See, e.g.,* Feb. 15, 2023 Conference Tr. 11:6-24; ECF No. 210 at 38:4-9.  For example, on January 30, defense counsel submitted a letter from Dr. Korff stating simply that Jimenez-Rodriguez requires "additional therapy" and recommending that the MDC "return him for follow-up appointments in a timely manner as directed by" his doctors.  *See* Def. Letter dated January 30, 2023, ECF No. 170 at 4; *see also supra* note 2 (describing the Court's appointment of Dr. Korff at defense counsel's request). Defense counsel later cited a March 24 letter from Dr. Raval stating that Jimenez-Rodriguez "requires further treatment and follow up to ensure preservation of vision."  ECF No. 212 at 1

---

[8] During a status conference on May 10, defense counsel stated that Jimenez-Rodriguez's next scheduled appointment was still more than a week away.  *See* May 10, 2023 Conference Tr. 15:23, ECF No. 216.  Thus, Jimenez-Rodriguez's follow-up treatment was scheduled to be at least three weeks later than his ophthalmologist had prescribed.

9

(quoting ECF No. 201-4 at 8).  These letters offered no specifics concerning when any irreversible harm might materialize.

On May 12, however, defense counsel submitted a fairly comprehensive answer to the Court's question.  Among other things, that letter attached a medical study by researchers at the University of Minnesota regarding the harms associated with delayed injections for patients with diabetic retinopathy.  *See* Def. Letter dated May 12, 2023, ECF No. 219 (and attachment number 2).  The Minnesota study found, among other things, that "patients whose appointments were delayed by greater than two weeks due to the COVID-19 pandemic had worse visual outcomes" than those whose appointments occurred on schedule.  ECF No. 219-2 at 8.  The defense letter also attached a study from researchers at the Cleveland Clinic and Case Western Reserve University that found similar results.  The Cleveland Clinic-Case Western study found that patients whose injections were delayed due to the COVID-19 pandemic (by approximately five weeks on average) had "lost vision by the following visit" to varying degrees, while "[p]atients who completed the scheduled visit and did not have any delay in care maintained stable vision."  *Id.* at 15.

There is now reason to believe, however, that the likelihood of additional delays in Jimenez-Rodriguez's treatment

is diminished.  This is because the MDC wrote the Court — also on May 12 — to follow up on the discussion at the May 10 status conference.  In that letter, the MDC confirmed that it had successfully scheduled monthly appointments for every month through year-end (December), and that it will inform the Court within seventy-two hours of any missed appointment.  *See* Letter from MDC Counsel dated May 12, 2023, ECF No. 218 at 1.  Given that the prior scheduling problems appeared to emanate from delays in getting appointments scheduled in the first place, the MDC's latest update is some cause for optimism.  The Court will, in the meantime, remain available to consider any breakdown in the new schedule.

## II.  Conclusion

For the foregoing reasons, Jimenez-Rodriguez's motion for bail — or, in the alternative, release pending trial — is denied.

SO ORDERED.

    /s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated:   May 23, 2023
         Brooklyn, New York