UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

              -against-                      **SENTENCING MEMORANDUM**

MARCOS JIMENEZ-RODRIGUEZ,               21-CR-194-2(EK)

              Defendant.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Marcos Jimenez-Rodriguez was indicted on multiple counts in connection with his alleged participation in a sex-trafficking and prostitution scheme. He pleaded guilty to one count of violating 18 U.S.C. § 2422(a), and was sentenced on March 19, 2024. The court conducted a *Fatico* hearing over three days. *See* Transcripts at ECF Nos. 275, 276, 277. This memorandum memorializes decisions on several disputed aspects of the case, including with respect to the applicable Sentencing Guidelines calculation.

        **I.    Motion to Compel Specific Performance of the Plea Agreement**

        The defendant asks the court to "order specific performance of the plea agreement." Jimenez-Rodriguez argues that the government should be ordered to consent to — or at least not oppose — the application of the three-level reduction

for acceptance of responsibility under U.S.S.G. § 3E1.1. Defendant's Dec. 13 Letter ("Dec. 13 Ltr."), ECF No. 259, at 1.

The defendant's argument is predicated on the course of plea negotiations between his attorney and the government. Jimenez-Rodriguez asserts that the prosecution asked him, during those negotiations, to agree to a "Statement of Facts" that would be incorporated into the plea agreement. *Id*. at 1-2. His attorney responded that the defense did not agree with substantial portions of that factual recitation — especially those concerning the use of violence in connection with the scheme, and the defendant's knowledge thereof. *Id*. at 2.

Thereafter, the government agreed to drop the Statement of Facts from the agreement, but still included the reduction for acceptance in the plea agreement the parties ultimately executed. *Id*. at 2; Executed Plea Agreement, ECF No. 267-1, ¶ 2. This, Jimenez-Rodriguez argues, constituted an implicit agreement that the defendant could argue against the assertions in the Statement of Facts and still qualify for acceptance credit.

The plea agreement does not actually say that the government will consent to, or will not oppose, acceptance credit *per se*. Instead, it describes the acceptance credits under U.S.S.G. §§ 3E1.1(a) and (b) as contingent on the defendant's conduct following the execution of the agreement:

2

> *If* the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3El.1(a) . . . . Furthermore, *if* the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before August 2, 2023, an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E 1.1(b) . . . .

Executed Plea Agreement, ¶ 2 (emphases added).

The defense suggests that it would be unsporting, at a minimum, for the government to include acceptance points in a Guidelines estimate — without additional comment — when it knows that the defendant intends to dispute conduct the government will allege at sentencing, and the government expects to oppose acceptance points on that basis. This characterization could be fair in an appropriate setting. Having made no factual findings on this subject, however, the court cannot say whether this case presents such a setting. And there is no need to do so: the issue is academic because — as set forth below — the three points are properly awarded for acceptance here, notwithstanding the government's contention otherwise.

## II. Application of the Sentencing Guidelines

The parties dispute three aspects of the Guidelines calculation in the Pre-Sentence Report: the four-level enhancement in Section 2A3.1(b)(1) for "conduct described" in 18 U.S.C. § 2241(a); the three-level "vulnerable victim"

3

enhancement in Section 3A1.1(b); and the Section 3E1.1 reduction for acceptance of responsibility.  I consider each issue in turn.

**A.    The "Conduct Described" in Section 2241 (Use of Violence)**

Jimenez-Rodriguez pleaded guilty to violating Section 2422(a) of Title 18.  The Guidelines' "Statutory Index" calls for the application of U.S.S.G. § 2G1.1 for such violations, so long as the "commercial sex act" in question did not involve a minor.  U.S.S.G. Appendix A.  Section 2G1.1 is the Guideline covering the promotion of a commercial sexual act, among other things.  But it contains a cross-reference to Section 2A3.1, covering criminal sexual *abuse*, if the offense "involved conduct" that is "described in 18 U.S.C. § 2241(a) or (b) or 18 U.S.C. § 2242."  *See* U.S.S.G. §2G1.1(c).

Jimenez-Rodriguez stipulated that the cross-reference applies, and correctly so.  The parties dispute, however, *why* it applies: because the offense involved conduct described in Section 2241(a) or (b), on the one hand, or Section 2242, on the other.  The difference matters because Section 2A3.1(b)(1) provides a four-level enhancement for conduct described in the former — Sections 2241(a) and (b) — but not the latter (2242). *See* U.S.S.G. §2A3.1(b)(1).

Section 2241(a) prohibits knowingly causing another person to engage in a sexual act "by using force against that

4

other person" or by "threatening or placing that other person in fear" that they "will be subjected to . . . serious bodily injury." Section 2242 criminalizes causing a person to engage in sexual acts by placing another person in fear, irrespective of whether the fear is of serious bodily injury.[1]

The government contends that Marcos Jimenez-Rodriguez's offense "involved conduct" violative of Section 2241(a). This is not the case, according to the government's theory, because of Marcos's own conduct *per se*. Rather, the government argues that Marcos and his brother Leonardo were engaged in "jointly undertaken criminal activity," and therefore U.S.S.G. § 1B1.3(a) renders Leonardo's actions "relevant conduct" as to Marcos, provided such actions were "reasonably foreseeable" in the context of their jointly undertaken crimes.[2] Government's Post-Hearing Memorandum ("Gov. Post-Hr'g Mem."), ECF No. 279, at 28-29.

The government points to one of Leonardo's actions in particular — an event in which Leonardo assaulted Yadira in

---

[1] Sections 2241 and 2242 both contain references to conduct occurring in "the special maritime and territorial jurisdiction of the United States or in a Federal prison," but those jurisdictional elements are not required for application of Section 2A3.1. *See United States v. Gilmore*, 599 F.3d 160, 168 n.6 (2d Cir. 2010).

[2] Because this opinion refers to three Jimenez-Rodriguez siblings — Marcos, Leonardo, and their sister Melisa — the defendants are referred to by their first names where appropriate.

5

2015.³  *Id*. at 30-31.  Yadira is the subject of *Marcos's* guilty-plea allocution: he admitted, in establishing a factual basis for his guilty plea, that he assisted in bringing Yadira here to engage in prostitution.  *See*, *e.g.*, Gov. Post-Hr'g Mem., at 2 (identifying Jane Doe #1 — referred to in Count Three of the Indictment — as Yadira).

Yadira testified at the *Fatico* hearing that Leonardo assaulted her in the house they shared with Marcos, while Marcos was home.  Hr'g Tr. Day Two, ECF No. 276, at 29:8-21.  Yadira recounted that she and Leonardo argued "because I got sick.  It was a sexually transmitted — a sexually transmitted disease, so I couldn't work."  *Id*. 29:11-14.  She explained that Leonardo was angry because "[t]here was no money," and he "ended up hitting me in the face.  He — and after that, my right eye couldn't open."  *Id*. 29:14-17.  In addition, she testified that Leonardo threw a glass bottle at her, and that "he pulled my hair" and she "started yelling, 'Let me go.'"  *Id*. 32:8-19.⁴

---

³ This order will refer to victims of abuse by their first names only. *See United States v. Graham*, No. 14-CR-500, 2015 WL 6161292, at *10 (S.D.N.Y. Oct. 20, 2015) (ordering that at trial victims be referred to "by their first names only" to protect them from "likely adverse personal, professional, and psychological consequences of publicly linking their identities to their prior prostitution activity").

⁴ Yadira testified that this episode was also preceded by argument concerning Leonardo's infidelity: she believed she had contracted the STD from Leonardo as a result of his endeavors.  *See* Hr'g Tr. Day Two, at 29 ("We argued over a woman because I got sick.").  Again, however, the suggestion of a potential second motive does not undermine my conclusion that Leonardo administered this beating for the primary purpose of causing her to engage in prostitution.

Yadira testified that Marcos was in the house during this exchange, and that "Marcos came knocking at the door to ask what had happened because he heard me screaming." *Id.* 29:19-20, 23-25. When Leonardo opened the door, Yadira explained that "Marcos sees me down there lying on the floor." *Id.* 32:25-33:1. Afterwards, Yadira testified that "Marcos was talking to Leonardo about what happened" while Melisa, their sister, "was begging me not to call the police." *Id.* 30:3-4.

Marcos contends that this event fails to justify the 2A3.1(b)(1) enhancement, for two reasons: first, because the incident "was not so severe as to place her in fear that she would be subjected to . . . serious bodily injury." *See* Defendant's Post-Hr'g Memorandum ("Def. Post-Hr'g Mem."), ECF No. 283, at 13. Second, Marcos contends that the government's evidence "did not establish that Marcos "had any awareness that such force was used to cause Yadira 'to engage in a sexual act.'" *Id.* at 19.

The Section 2A3.1 enhancement applies here. *First*, the force to which Yadira testified was more than sufficient to place a reasonable person in fear of "serious bodily injury." Serious bodily injury is defined as an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention." U.S.S.G. §1B1.1, cmt. n.(1)(M). But there is no

7

requirement that the feared "impairment be permanent" in order to be serious. *United States v. Agron*, 921 F.2d 25, 26 (2d Cir. 1990) (finding that a stun gun can cause serious bodily injury). Throwing a "bottle of liquor with alcohol" at a victim can cause facial lacerations, a concussion, and more; it is sufficient to put a victim in fear of serious bodily injury, even if it ultimately misses the target. Hr'g Tr. Day Two, at 32:8-19. And a punch in the eye with a closed fist can reasonably inspire such fear, as well: among other things, it can threaten the vision of the person assaulted. In this case, Yadira testified that her right "eye was closed for a week" after this incident. *Id*. 78:1-6.

*Second*, this beating was <u>in furtherance of</u> the jointly undertaken criminal activity.[5]

---

[5] Marcos contends that even if he and his brother both participated in the prostitution business, the government has not established that they did so as part of a "jointly undertaken criminal activity." U.S.S.G. § 1B1.3, cmt., n.1. Thus, Marcos contends, the court cannot make the "particularized finding" regarding the scope of the joint activity required by *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).

Marcos pleaded guilty to Count Three of the Superseding Indictment, for knowingly and intentionally persuading, inducing, enticing, and coercing Yadira to travel to the United States to engage in prostitution. Despite the fact that the indictment frames that conduct as having occurred "between May 2007 and May 2018," ECF No. 133, at 2, Marcos has taken the position at sentencing that his participation in the scheme ended when he and Yadira crossed the border. Among other things, the defense contends that Marcos worked in construction for significant parts of the charged period.

Even if Marcos worked in construction for meaningful stints, the hearing included extensive testimony concerning his continued participation in the prostitution business. He drove women to prostitution appointments; he supervised Abigai in the purchase of condoms in bulk; and he worked personally in brothels, among other things. Hr'g Tr. Day Two, at 23:13-17; 37:17-38:5; Hr'g Tr. Day One, ECF No. 275, at 27:13-18; 28:1-24.

As a threshold matter, Yadira is one obvious point of connection between Marcos's participation in the scheme and his brother's — Marcos facilitated her entry into the United States, knowing and intending that she would engage in prostitution, and Leonardo supervised her engagement in such activity — including by the threat of violence. Hr'g Tr. Day Two, at 7:11-13; 29:8-19. Marcos also drove Yadira to prostitution appointments. *Id.* at 23:13-17.

It is true that Yadira's testimony about the 2015 beating spoke to dual motives, only one of which related to the prostitution business. *Id.* at 67:24-68:5; *see also supra* n.4. But it remains clear that this beating was "in furtherance of" the prostitution business. Yadira testified that she worked in prostitution for Leonardo "[b]ecause he would threaten me," and that he hit her "[b]ecause I wasn't working" after she contracted the STDs at issue. Hr'g Tr. Day Two, 7:9-13; 67:12-17. This was a problem for Leonardo because there "was no money" — plainly a business-related reason. *Id*. 29:14-17; *see also id.* at 67 ("I was sick. It hurt. I wasn't working, and he'd said to me, 'Go out. Work just two or three days to be able to pay the rent.'").

*Third*, it was <u>foreseeable</u> to Marcos that Leonardo would employ such force in the course of their jointly undertaken endeavors. The evidence established that Marcos was

9

aware of Leonardo's use of violence in a number of settings — some more directly related to the prostitution business, and some less so.  Another victim-witness — Abigai — testified that she was Marcos's girlfriend for an extended period.  At one point, she overheard Leonardo tell Marcos that he "had beaten Fabiola — Leonardo's girlfriend, who also worked as a prostitute — because she didn't want to be with him any longer."  Hr'g Tr. Day One, at 24:1-3, 53:2-16.  According to Abigai, "Leonardo thought that beating [Fabiola] up, that then she would just submit herself."  *Id*. 53:15-16.

Abigai also explained that Marcos employed violence himself — against her.  The government does not contend that such violence caused serious bodily injury, so as to qualify for the enhancement.  Nevertheless, this testimony does tend to show that the use of violence was contemplated in the course of the jointly undertaken prostitution business.  Abigai testified that because her English skills were superior to Marcos's, he enlisted her in the purchase of condoms in bulk from a supplier.  *Id.* at 28:1-25, 29:1-6.  Marcos would later sell the condoms to "the people who worked in prostitution."  *Id*. at 29:4-6.  When Abigai expressed hesitation about participating in this activity (for fear of getting caught), Marcos "would hit me."  *Id*. at

10

28:9-11.  "He would hit me on my ears.  Sometimes he would hit me on my mouth."  *Id.*[6]

Marcos also sought (unsuccessfully) to persuade Abigai to engage in prostitution.  When Abigai refused, "he became, I don't know, more violent."  *Id.* 46:4-14.  When she told Marcos that "You're such a jerk if you think I'm going to work in prostitution," "he started to beat me."  *Id.* 46:16-20.  She testified about one such instance in detail, stating among other things that "he beat me, and then he put his belt around my neck" and "dragged me all across the apartment" — to the point that she felt her "eyes coming out of my head."  *Id.* 46:19-24.

All of this evidence, considered in the aggregate (and with other evidence adduced), was sufficient to establish the applicability of the 2A3.1(b)(1) enhancement by a preponderance of the evidence.

## B.  Vulnerable Victim Enhancement

The government seeks the application of the enhancement in Section 3A1.1(b)(1), for defendants who knew or should have known that a victim of the offense was a vulnerable

---

[6] At this point, it is appropriate to note that the defense wished – and intended – to call Melisa Jimenez-Rodriguez as a witness.  She would have testified that Marcos was not violent and did not work in the prostitution business.  This testimony is discussed below in Section III.  Despite not calling Melisa, the defense did call a paralegal on the defense team, who testified to the substance of what Melisa said to the defense team in preparation for sentencing.  This testimony was contradicted by Abigai and Yadira and cannot be credited in light of the larger record.

11

victim.  They characterize one of the two testifying victims — Yadira — as fitting that descriptor, but not Abigai.

The commentary defines a "vulnerable victim" as a person "(A) who is a victim of the offense of conviction and any" relevant conduct, and "(B) who is *unusually* vulnerable due to age, physical or mental condition, or who is otherwise *particularly* susceptible to the criminal conduct."  U.S.S.G. §3A1.1, cmt., n.2 (emphases added).  The victim must have been "unusually vulnerable" not in the abstract, but in relation to the "larger class of potential victims" to which he or she belongs — here, trafficking victims.  *United States v. McCall*, 174 F.3d 47, 50 (2d Cir. 1998).  The Second Circuit has noted the general "skepticism" in the case law about "generalized assumptions about a victim's vulnerability based upon that person's membership in a class."  *Id.* at 51.  Vulnerability is a function, for this purpose, of the victim's "ability to protect himself [or herself] from the crime," not their susceptibility to suffer a greater "extent of harm" if the crime occurs.  *United States v. O'Neil*, 118 F.3d 65, 75 (2d Cir. 1998).

That said, the defendant need not have *chosen* the victim "because of his or her vulnerability — it is sufficient that he know or should have known of this quality when deciding to go ahead with the crime."  *McCall*, 174 F.3d at 50; *see* U.S.S.G. §3A1.1, cmt., n.2.  As the government is seeking this

12

contested enhancement, it of course "bears the burden of proving facts relevant" thereto. *United States v. Valdovinos-Soloache*, 309 F.3d 91, 94 (2d Cir. 2002).

In this Circuit, the enhancement has been applied to victims who "couldn't . . . leave the house" and had no access to "their passports, visas and other documents," *United States v. Sabhnani*, 599 F.3d 215, 252 (2d Cir. 2010); who were "Chinese nationals with little means, education, and English proficiency," *United States v. Zhong*, 26 F.4th 536, 564 (2d Cir. 2022); and victims who were known to have been "repeatedly targeted" by the same scheme with success. *United States v. Powell*, 713 F. App'x 36, 38-39 (2d Cir. 2017).

This case does not fit those criteria, when compared to trafficking victims generally. When she met Leonardo at age 18, Yadira had graduated from high school and received a "technical degree" in accounting. Hr'g Tr. Day Two, at 58:6-7. She kept her passport and other identity documents in her possession at all times in the United States. *Id*. at 64:5-11. She spoke Spanish, not English, but the defense persuasively demonstrated that a panoply of services is available to Spanish speakers in Flushing. *See id.* at 60:20-25, 61:1-14. When she could not afford to pay rent in the apartment she shared with Marcos and Melisa, she moved out. *Id*. 64:21-25, 65:1-4. And when Yadira was assaulted by a stranger on the street, she went

13

to the police precinct to report the crime "[t]hat same night." *Id.* 73:23-25, 74:1-4.

Most importantly, the defense presented evidence contradicting the government's assertions on the question of who kept what money. The government initially argued that Marcos, in concert with Leonardo and Melisa, forced Yadira to work in prostitution and "took all of the money that they made." *See* Government Sentencing Letter, ECF No. 253, at 2. After the *Fatico* hearing, the government softened its stance on this issue, contending that Marcos took "most" of the money she earned "so they could wire it to Leonardo." Gov. Post-Hr'g Mem., at 12. But the defense presented evidence that between 2010 and 2018, Yadira sent members of her family 362 wire transfers totaling $139,558.60. Hr'g Tr. Day Three, ECF No. 277, 61:11-20; Defendant's Exhibits 10, 11; Def. Post-Hr'g Mem., at 25 & n.7.[7]

The government also describes an incident in which Leonardo locked Yadira in her room — evidence, they argue, that Yadira was made to feel "reliant on Leonardo." Gov. Post-Hr'g Mem., at 34. But it is the characteristics of the victim that matter for the Section 3A1.1(b)(1) enhancement, more than the

---

[7] Even when Yadira was actively wiring money to Leonardo in Mexico (between 2015 and 2018), she still sent her family $53,924.84, more than double the amount she sent Leonardo during the same period. Hr'g Tr. Day Three, 61:2-25, 62:1-3; Defendant's Exhibits 10, 11; Def. Post-Hr'g Mem., at 25 & n.7.

14

conduct of the defendant (let alone a codefendant).  *See, e.g., O'Neil*, 118 F.3d at 75.

The government relies on the Eleventh Circuit's decision in *United States v. Monsalve*, 342 F. App'x 451, 457 (11th Cir. 2009), in seeking the enhancement.  But in that case, the victims did not speak the language and "had no identity papers, and would thus be unlikely to report criminal conduct to the police."  *Id*. at 458.  Here, as noted, those factors are not present.

To the extent the defendant's conduct does matter, the evidence regarding Abigai would be relevant as well.  Abigai testified that she left Marcos in 2009.  Hr'g Tr. Day One, at 17:13-14.  After she left him, he called her phone, *id*. 50:10-15, and she saw him on the street, when he "offered to take me over to the subway station."  *Id*. 51:1-5.  When she got in the car, Abigai testified that Marcos "tried to convince me to return back with him," and refused to allow her out of the car until she "opened the door, and [] was going to jump out of the car."  *Id*. 51:17-25, 52:1-4.  At that point, Marcos relented, and let her out of the car peacefully.  *Id*. at 52:2-4 ("[W]hen he saw that I actually opened the door, he told me not to do

15

that. And so he took me over to the subway station. That's the last time I saw him.").[8]

**C.   Acceptance of Responsibility**

Based on application of the Guidelines set out above, the defendant's contentions at sentencing are not inconsistent with acceptance of responsibility.

"A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. §3E1.1, cmt., n.1(A). "[T]he fact that a defendant's challenge is unsuccessful does not necessarily establish that it was either a false denial or frivolous." *Id*.

"Falsely denies" generally applies to testimony, and Jimenez-Rodriguez has not given any. *See United States v. Ruggiero*, 100 F.3d 284, 295 (2d Cir. 1996) (analyzing whether a defendant's "testimony at the *Fatico* hearing denying his involvement" constituted a "false denial of relevant conduct" precluding a reduction for acceptance of responsibility). "Frivolously contests" may apply to a lawyer's arguments, *see*

---

[8] As the court indicated on the record at sentencing, none of this analysis should be read to understate the extent to which the victims of this offense were "vulnerable" in the plain-English sense. They grew up in poverty and endured dangerous, illegal, and frightening work. Surely they would not have submitted to the defendant's entreaties and abuses if not for that vulnerability. But the narrower question of whether the Guidelines enhancement applies must be informed by the *relative* analysis above.

16

*United States v. Purchess*, 107 F.3d 1261, 1264-65 (7th Cir. 1997) (upholding the district court's denial of reduction for acceptance of responsibility where "the lawyer made frivolous arguments"), but not in the instant case: for the reasons set forth above and on the record at sentencing, none of Jimenez-Rodriguez's opposition to the Guidelines enhancements at issue is properly characterized as frivolous.

### III. Alleged Due Process Violations

#### A.   Melisa Jimenez-Rodriguez's Testimony

The defense claims that the government violated the due process clause through its contact with the attorney for a putative defense witness.  Specifically, Marcos intended to call his sister, Melisa, as a witness at the *Fatico* hearing.  Melisa was indicted in this case alongside her brothers; she pleaded guilty before either of them and was sentenced in February 2023. ECF No. 185.  The defense contends that Melisa "would have provided material, exculpatory evidence" on Marcos's behalf. Defendant's January 19 Letter ("Def. Jan. 19 Ltr."), ECF No. 269, at 1.

After the defense provided a witness statement from Melisa to the government pursuant to Rule 26.2, the government contacted Melisa's court-appointed attorney by telephone.  Asked later by the court to explain its motivation for calling, the government responded that it did not know whether Melisa's

17

attorney was aware that she intended to testify.[9]  Among other things, the government indicated that it sought to avoid the possibility that Melisa would arrive at the *Fatico* hearing without counsel, and the attendant response from the court would delay the proceedings.

The defense argues that even if the AUSA's question about Melisa's counsel's awareness of the situation was proper, the subsequent "perjury warning" was not.  The government responds that this warning (or statement, depending on who is describing it) was not gratuitous: instead, it came in response to a question from defense counsel about whether the government would, in substance, be "o.k." with Melisa testifying.  (The government suggested that this question arose out of the government's prior decision to treat Melisa as both defendant *and victim* in connection with her case.)  In responding to that question, the government asserts, it was only natural to indicate that the government would not be o.k. with *perjurious* testimony.

Even accepting all of the defense assertions as true, no Supreme Court or Second Circuit authority supports the assertion that the conduct at issue violated the due process clause.  The defense was permitted to introduce the substance of

---

[9] According to the government, the witness statement the defense provided contained no indication that Melisa's attorney had been present when she gave it.

18

Melisa's statements to the defense team, through a paralegal the defense called at the *Fatico* hearing.  Hr'g Tr. Day Three, at 36:9-45:14; *supra* n.6.  Moreover, the defense acknowledges that it did not "enforce" the subpoena it had issued to Melisa, further undermining the contention that it was disadvantaged.  This motion is denied.[10]

       SO ORDERED.

                                               /s/ Eric Komitee
                                               ERIC KOMITEE
                                               United States District Judge

Dated:     March 20, 2024
             Brooklyn, New York

---

[10] The defense also contends that the government violated the due process clause because no agent took notes at certain preparatory sessions with certain witnesses.  Again, the defense does not cite sufficient authority for that claim.